2011 ME 123

**Edward RUSSELL**

v.

**EXPRESSJET AIRLINES, INC.**

Supreme Judicial Court of Maine.

Argued: Sept. 14, 2011.
Decided: Dec. 6, 2011.

Jeffrey T. Piampiano, Esq., Drummond Woodsum & MacMahon, Portland, and Alison J. Bell, Esq. (orally), Langrock Sperry & Wood, LLP, Burlington, VT, for appellant ExpressJet Airlines, Inc.

Guy D. Loranger, Esq. (orally), Nichols, Webb & Loranger, Saco, on the briefs, for appellee Edward Russell.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

MEAD, J.

[¶ 1] ExpressJet Airlines, Inc., appeals from a judgment of the Superior Court (Cumberland County, *Warren, J.*) following a jury verdict finding that ExpressJet discriminated against Edward Russell based on his sexual orientation. ExpressJet argues that (1) it was entitled to judgment as a matter of law on liability; (2) the court applied the incorrect statutory cap on damages; and (3) the court erred in denying ExpressJet's motion for a new trial or remittitur of damages. We affirm the judgment.

## I. BACKGROUND

[¶ 2] We view the evidence presented at trial in the light most favorable to the jury's verdict. *Jacob v. Kippax,* 2011 ME 1, ¶ 2, 10 A.3d 1159. In 1998, Russell joined Continental Express in Portland as an agent and was promoted to supervisor the following year. He joined ExpressJet as a supervisor when it opened in Portland in April 2002. At that time, the general manager of the Portland station was a gay man. Russell is also gay and was open about his sexual orientation during his employment with Continental and ExpressJet.

[¶ 3] Around October 2003, Russell learned from ExpressJet's regional director, Ewen Barr, that three women had filed a complaint against the company alleging that ExpressJet only hired gay men for management positions. Shortly thereafter, the gay man who was the general manager in Portland left the station. Russell assumed the duties of general manager with assistance from another supervisor, Leo Dubay. According to Dubay and other ExpressJet employees, Russell essentially ran the station and did an excellent job while the company searched for a new general manager. Russell then had a conversation with Barr about becoming the general manager in Portland. Barr said that was "not going to happen," but provided no explanation. When Russell approached Barr a second time about becoming the general manager, Barr stated that ExpressJet had just gotten out of "a boiling pot of water," which Russell understood to be a reference to the complaint filed against the company by the three women. Barr then told him that it was "not going to happen" and he should not waste his time.

[¶ 4] Later, John Girouard was hired to fill the general manager position. Russell helped Girouard become familiar with the station's operations and his responsibilities. Girouard referred to Russell as his "right-hand-man" and said that he did a "fantastic job." When Lavoice Thomas succeeded Barr as regional director, Girouard told him that Russell was a valuable employee. Nevertheless, in February 2004, Thomas told Girouard he would be better off if he fired Russell. Girouard declined to do so and left the Portland station on medical leave.

[¶ 5] Several other general managers were hired following Girouard. Russell filled in and performed additional duties while the Portland station transitioned from one general manager to the next. During this period, Russell called Thomas and left a message expressing his interest in becoming the general manager in Portland, but received no reply. Later, Rus-

sell told Thomas in person that he wanted to apply for the general manager position at the Portland station. Thomas replied that ExpressJet had a policy that prohibited the direct promotion of an employee to general manager from within his own station. Russell was unaware of such a policy and ExpressJet later conceded that the policy was an unwritten one. ExpressJet also acknowledged that there had been several exceptions to the policy in the past and Russell spoke to one of the temporary general managers in Portland who said that he had been promoted to manager from within his own station.

[¶ 6] In December 2006, Russell left messages with ExpressJet's human resources department regarding unfair hiring practices; the department did not return his calls. Around that same time, Thomas announced that Michael Rosenbaur was taking over as general manager of the Portland station. Rosenbaur had no prior experience with ExpressJet. In March 2007, around the same time Rosenbaur returned from training at ExpressJet's headquarters, he had a conversation with another coworker while Russell was present in which he stated that the Portland station needed to "clean house" and that homosexuals are "an abomination in God's eyes."[1]

[¶ 7] After Rosenbaur was hired, Russell contacted Thomas again about being the general manager of the Portland station. Thomas suggested that Russell needed to move to a new station. He recommended that Russell apply for openings in Manchester, New Hampshire, and Colorado Springs, Colorado. When Russell contacted him to discuss his suggestions, Thomas said that Manchester was "not going to happen" and the Colorado Springs position had already been filled. In April 2007, Russell resigned without ever having formally applied for a general manager position with ExpressJet.

[¶ 8] Russell brought an employment discrimination claim against ExpressJet pursuant to the Maine Human Rights Act (MHRA). *See* 5 M.R.S. § 4572(1)(A) (2010). At trial, ExpressJet moved for judgment as a matter of law at the close of all the evidence. The court denied the motion, finding that Russell had produced enough evidence for the jury to decide whether ExpressJet's actions had made it futile for him to apply for a general manager position. The court then instructed the jury on that issue:

[T]o prevail on his claim of employment discrimination, under the circumstances of this case, Mr. Russell must prove, by a preponderance of the evidence, first, that ExpressJet subjected him to adverse action in connection with his employment, and, second, that his sexual orientation was a motivating factor for ExpressJet's adverse action. Now, to prove that he was subjected to adverse action under the circumstances of this case, Mr. Russell must prove by a preponderance of the evidence, first, that ExpressJet prevented him from applying for the position of general manager at the Portland Jetport, or at other locations, second, that he would have applied for a general manager position had it not been for ExpressJet's actions, and three, or third, that he was otherwise qualified to be general manager. On the issue of whether ExpressJet prevented Mr. Russell from applying for a promotion, it is sufficient if Mr. Russell

---

1. ExpressJet argues that Rosenbaur was not involved in the decision making process for the general manager position, and that when the statement was made the position was already filled. However, the trial court committed no clear error in admitting the statement to support Russell's argument that anti-gay sentiment permeated ExpressJet's management throughout his tenure with the company.

proves that the words or actions of ExpressJet's managers persuaded him it was futile to apply.

[¶ 9] Neither party objected to that portion of the instructions. The jury found, as reflected on the jury verdict form, that (1) ExpressJet had prevented Russell from applying for a job for which he was qualified and for which he otherwise would have applied; (2) Russell's sexual orientation was a motivating factor; (3) ExpressJet would not have taken the same actions if it had not considered Russell's sexual orientation; and (4) ExpressJet acted with malice or reckless indifference towards Russell's rights. The jury awarded Russell $47,000 in lost income, $500,000 in compensatory damages, and $500,000 in punitive damages.[2] The court applied a $500,000 statutory cap and treated the entire award as compensatory damages. *See* 5 M.R.S. § 4613(2)(B)(8)(e)(iv) (2010). ExpressJet's motion for a new trial or, in the alternative, for remittitur of damages was denied. ExpressJet timely appealed.

## II. DISCUSSION

### A. The Futility Exception

[¶ 10] ExpressJet argues that it was entitled to judgment as a matter of law because the evidence failed to establish that it was liable pursuant to the MHRA. "We review the denial of a motion for judgment as a matter of law de novo to determine if any reasonable view of the evidence and those inferences that are justifiably drawn from that evidence supports the jury verdict." *Madore v. Kennebec Heights Country Club*, 2007 ME 92, ¶ 5, 926 A.2d 1180 (citation omitted) (quotation marks omitted).

[¶ 11] In order to establish a prima facie case of employment discrimi-

nation pursuant to the MHRA, an employee must show that (1) the employee is a member of a protected class; (2) the employee applied for and was qualified for an open position the employer was seeking to fill; (3) the employee was not hired for that position; and (4) the position was later filled by a person who is not a member of the protected class. *Cookson v. Brewer Sch. Dep't*, 2009 ME 57, ¶ 14, 974 A.2d 276. The establishment of the prima facie burden simply allows a plaintiff to proceed with the action. The burden of proof remains with the plaintiff at all times. If the employer responds to the prima facie presentation of the employee with evidence that the "*adverse employment action* was taken for a legitimate, nondiscriminatory reason," the burden is on the employee to persuade the fact-finder that there was unlawful discrimination. *Id.* (emphasis added); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Accordingly, the identification of the "adverse employment action" is a critical element of such claims.

[¶ 12] Ordinarily, in cases of a claimed failure to hire or failure to promote, the employee will provide evidence of the adverse employment action by showing that he applied for a position and was not hired for that position. Russell's failure to apply for a general manager position, however, is not fatal to his employment discrimination claim in this case.

[¶ 13] The United States Supreme Court has explained that "[w]hen a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of

---

2. The parties and the trial court agreed that the punitive damages element in the jury verdict form was erroneous and due to a clerical error. The judgment ultimately entered by the court does not include punitive damages.

submitting an application." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 365–66, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). "Federal law guides our construction of the MHRA." *Cookson,* 2009 ME 57, ¶ 14, 974 A.2d 276. ExpressJet suggests that the futility exception articulated in *Teamsters* is limited to class action cases involving widespread discrimination and argues that it should only be applicable in situations where there is pervasive discrimination by an employer. *See Brown v. Coach Stores, Inc.,* 163 F.3d 706, 711 (2nd Cir.1998) (discussing a limited view of the *Teamsters* decision). Although we conclude that an individual plaintiff may avail himself or herself of the futility exception even in the absence of widespread or pervasive discrimination by an employer, *see, e.g., Stiefel v. Bechtel Corp.,* 624 F.3d 1240, 1246 (9th Cir.2010) (acknowledging the availability of the futility exception in single plaintiff Title VII actions pursuant to the Civil Rights Act and noting that "[a]n employer may be liable for discriminating against a single employee in spite of its own generally followed anti-discrimination policy"), we recognize that the exception is a narrow one.

[¶ 14] Accordingly, the futility exception to the usual rule that an individual must apply for a position before he can claim that he was denied that position requires affirmative proof that applying for a specific employment position would have been futile based upon the employer's discriminatory actions or statements. An employee's subjective sense of discouragement, without more, is insufficient to sustain his burden of proving futility.

[¶ 15] Russell was open about his sexual orientation while employed with ExpressJet. While the position was vacant, Russell discussed becoming the general manager of the Portland station with Barr, ExpressJet's regional director. Barr responded that ExpressJet had just gotten out of "a boiling pot of water," a likely reference to a complaint filed by three women alleging that ExpressJet only hired gay men for management positions. Barr then advised Russell that he would not get the general manager position and to not waste his time. Russell also told Thomas, Barr's successor, that he wanted to apply for the general manager position in Portland. Thomas advised him that a company policy prevented Russell from being promoted directly to general manager of his current station despite the fact that the policy was unwritten and exceptions to it had been made in the past. Thomas recommended that Russell consider applying for the general manager openings at two other locations, but when Russell called Thomas to discuss those positions, Thomas reported that those opportunities were, in fact, not available. Although there was conflicting evidence regarding the futility issue, the record contains sufficient evidence to support the jury's finding that the statements and actions of ExpressJet's management made it futile for Russell to apply for the general manager position.

### B. Statutory Cap on Damages

[¶ 16] ExpressJet next argues that the court applied the wrong statutory cap to the jury's award pursuant to 5 M.R.S. § 4613(2)(B)(8)(e) (2010).[3] We review issues of statutory interpretation de

---

**3.** The relevant statutory section provides:
 (e) The sum of compensatory damages awarded under this subparagraph for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, other nonpecuniary losses and the amount of punitive damages

awarded under this section may not exceed for each complaining party:
 (i) In the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year; $50,000;

novo. *See Anastos v. Town of Brunswick*, 2011 ME 41, ¶ 5, 15 A.3d 1279. "In interpreting a statute, we look first to the plain language of the statute to discern the Legislature's intent." *Tolliver v. Dep't of Transp.*, 2008 ME 83, ¶ 11, 948 A.2d 1223. "If the statute's meaning is clear, we do not look beyond its words, unless the result is illogical or absurd." *Id.* (quotation marks omitted). The court applied section 4613(2)(B)(8)(e)(iv) to the jury's award, which caps damages at $500,000 for employers with more than 500 employees, because ExpressJet has more than 500 employees nationwide. ExpressJet argues that the court should have applied the $50,000 cap found in section 4613(2)(B)(8)(e)(i) for employers who have between fourteen and 101 employees because ExpressJet has relatively few employees in Maine. However, a plain language reading of the statute leads to the conclusion that the Legislature did not intend to distinguish between the number of employees in Maine and the number of employees nationwide; rather, the clear intent of the graduated caps is to protect smaller employers from large damage judgments that could potentially devastate them. The Legislature clearly intended that the protections of the MHRA reach employers who are based in Maine even if they have out-of-state employees as well as employers based elsewhere who have employees in Maine. ExpressJet is a large employer with more than 500 employees nationwide. The court applied the proper statutory cap to the jury's award pursuant to section 4613(2)(B)(8)(e).

## C. Motion for New Trial or Remittitur

 [¶ 17] ExpressJet further argues that the court should have granted its motion for a new trial or remittitur of damages because the jury's award was excessive. We review the denial of a motion for a new trial deferentially for a clear and manifest abuse of discretion because "the trial court is in the best position to assess the jury's reactions and motivations." *See Seabury–Peterson v. Jhamb*, 2011 ME 35, ¶ 14, 15 A.3d 746. As we have explained, the language of section 4613(2)(B)(8)(e) provides a low threshold of evidence for awarding compensatory damages that is similar to "the pain, suffering, mental anguish and loss of enjoyment of life criteria of general tort actions." *See Kopenga v. Davric Me. Corp.*, 1999 ME 65, ¶ 18, 727 A.2d 906. A compensatory damages award pursuant to the MHRA may be based solely on a plaintiff's own testimony. *See id.* ¶ 19.

[¶ 18] Russell testified that ExpressJet's refusal to consider him for the general manager position forced him to take a leave of absence and seek treatment for stress, anxiety, and depression. He also stated that his symptoms persisted when he returned to work and he had to stop seeking treatment because it was difficult for him to afford therapy and medication. This testimony provided the jury with sufficient evidence to support its compensatory damages award. Further, the court properly instructed the jury that damages may not be awarded on the basis of passion, prejudice, or sympathy. The court did not abuse its discretion in denying ExpressJet's motion for a new trial or remittitur of damages.

The entry is:

Judgment affirmed.

----

**(iv)** In the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year; $500,000.

5 M.R.S. § 4613(2)(B)(8)(e)(i), (iv) (2010).