*Mc/*

STATE OF MAINE                          SUPERIOR COURT
CUMBERLAND, ss.                         CIVIL ACTION
                                        DOCKET NO. CV-09-225

AIMEE HELWIG

v.                                      POST-JUDGMENT ORDERS

INTERCOAST CAREER INSTITUTE


## INTRODUCTION

This matter is before the court on post-trial motions filed after a jury verdict

finding that InterCoast Career Institute (ICC) discriminated against Aimee Helwig

(Helwig) in an educational career program in nursing. The following motions are

pending: plaintiff's post-trial brief[1] regarding burden of proof with respect to a cap on

damages; defendant's brief regarding a cap on the damages awarded under the retaliation

claim; and defendant's motion for a new trial and/or to reduce or modify verdict or

judgment and for judgment not withstanding the verdict.  The court will address these

motions *ad seriatim.*

## BACKGROUND

This is an educational discrimination case[2] in which Helwig was a nursing student

at ICC, which has a campus in South Portland, Maine.  Helwig alleged in her complaint

that a faculty member sexually harassed her and then ICC retaliated against her when she

---

[1] The court treats the plaintiff's post-trial brief and the defendant's brief as motions raising the issues contained therein respectively.

[2] Although ICC did not timely object to Plaintiff's characterization at times of her claims as employment discrimination claims, the court, as the jury did, analyzes this case as one for educational discrimination.

complained about the harassment, culminating in her termination from ICC for allegedly violating the InterCoast Practical Nursing Code of Professional Conduct. Helwig alleged in her complaint a number of counts, but she proceeded at trial on the claims of retaliation, slander and breach of contract. She sought damages, including general and noneconomic damages, economic damages, lost wages, punitive damages and attorney's fees. ICC denied each of Helwig's claims and countered that ICC terminated her as a student for cause. ICC further alleged that Helwig failed to mitigate her damages.

At trial, the jury awarded Helwig the following: $100,000 in lost wages on her claim for retaliation; $150,000 on her claim for emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life; $30,000 for punitive damages; and $20,000 on her claim of breach of contract.

The jury found as disclosed in the verdict form the following: (1) Helwig engaged in protected activity; (2) ICC made educational decisions that adversely affected Helwig; (3) her complaints about sexual harassment or retaliation were a motivating factor in ICC's adverse educational decisions; (4) ICC would not have made the same educational decisions even if it had not considered her complaints about sexual harassment or retaliation; (5) ICC caused Helwig lost wages of $100,000 by its unlawful discrimination based on retaliation; (6) ICC caused emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life to Helwig because of ICC's unlawful discrimination based on retaliation; (7) ICC acted with malice or reckless disregard of the rights of Helwig to the amount of $30,000; (8) ICC did not disparage Helwig's reputation or character; (9) there was a contract to provide a business-like professional learning environment between ICC and Helwig; (10) ICC breached its contract with

2

Helwig to provide a business-like professional learning environment; and (11) the damages for breach of that contract are $20,000.

## STATUTORY CAP ON DAMAGES

After the jury had been dismissed, defendant raised an issue concerning a statutory cap on damages. The issue at that time was whether the court is to consider the number of employees statewide or nationwide pursuant to 5 M.R.S.A. § 4613(2)(B)(8).[3] The defendant argued that there was no evidence concerning the number of employees nationwide, that it has only 30 employees at its Maine Nursing School, and that the correct reference under 5 M.R.S.A. § 4613(2)(B)(8) is the number of employees statewide, thus damages should be capped at $50,000.

In its post-trial motion, ICC recognized that the cap under section 4613(2)(B)(8) does not apply because it relates to employment discrimination claims; however defendant argued that another cap under section 4613(2)(B)(7) applies to education claims. ICC contends that this statutory section imposes a cap of $20,000 on all damages in the first non-employment discrimination claim against a particular defendant.

The basis for defendant's post-trial argument is that this is not an employment discrimination case but an educational discrimination case. The court quite agrees that this is an educational discrimination case. The jury evaluated the facts on this basis.

---

[3] Recently, the Law Court interpreted section 4613(2)(B)(8)(e)(iv) and concluded:
> [T]he Legislature did not intend to distinguish between the number of employees in Maine and the number of employees nationwide; rather, the clear intent of the graduated caps is to protect smaller employers from large damage judgments that could potentially devastate them. The Legislature clearly intended that the protections of the MHRA reach employers who are based in Maine even if they have out-of-state employees as well as employers based elsewhere who have employees in Maine.

*Russell v. ExpressJet Airlines, Inc.*, 2011 ME 123, ¶ 16, 32 A.3d 1030. For purposes of this case, the court applies any nationwide figure that may apply.

3

Helwig alleged and the jury determined that ICC made adverse educational decisions based on sexual harassment or retaliation, caused Helwig lost wages and pain and suffering, acted with malice or reckless disregard of Helwig's rights, and breached its educational contract with her. ICC terminated Helwig from an educational program for nurses that contained both an educational component and a clinical training component. Notwithstanding the clinical training program, this remains an educational discrimination case. The MHRA prohibits discrimination in education whether academic, occupational training or other educational program. 5 M.R.S.A. § 4602.[4] The MHRA protects the opportunity to participate in all educational, apprenticeship, and on-the-job training programs without discrimination because of sex. 5 M.R.S.A. § 4601.[5] Educational opportunities free of discrimination are declared to be a civil right. *Id.* The MHRA further prohibits retaliation and coercion with respect to opposing any discriminatory acts. 5 M.R.S.A. § 4633.[6]

Aggrieved persons alleging retaliation under section 4633 may utilize the procedures and obtain the remedies contained in sections 4611 to 4614 and 4621 to 4623. 5 M.R.S.A. § 4633(3). In any action filed under the MHRA, "[i]f the court finds that unlawful discrimination occurred, its judgment must specify *an appropriate remedy* or

---

[4] It is "unlawful educational discrimination" on the basis of sex to "[e]xclude a person from participation in, deny a person the benefits of, or subject a person to, discrimination in any academic, extracurricular, research, occupational training or other program or activity." 5 M.R.S.A. § 4602.

[5] The Maine Human Rights Act (MHRA) ensures the right to freedom from discrimination in education by recognizing and declaring as a civil right "[t]he opportunity for an individual at an educational institution to participate in all educational, counseling and vocational guidance programs and all apprenticeship and on-the-job training programs without discrimination because of sex, sexual orientation, a physical or mental disability, national origin or race." 5 M.R.S.A. § 4601.

[6] The MHRA expressly provides a "person may not discriminate against any individual because that individual has opposed any act or practice that is unlawful under this Act or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this Act." 5 M.R.S.A. § 4633(1).

4

remedies for that discrimination. The remedies may include, *but are not limited to . . .* (1) an order to cease and desist . . . (7) civil penal damages . . ." 5 M.R.S.A. §4613(2)(B) (emphasis supplied).[7] Thus, the MHRA provides a list of remedies but does not limit remedies to those contained in the statutory list and directs the court to utilize appropriate remedies. *Id.* The only limitation on remedies is "an appropriate remedy" and a cap on the amount of civil penal damages.[8] The MHRA further authorizes to the prevailing party reasonable attorneys' fees and costs. 5 M.R.S.A. § 4614.

There has been little case law interpreting the Maine Human Rights Act in an educational context. "It is appropriate to look to analogous federal case law for guidance in the interpretation of the Maine Human Rights Act (MHRA). See *Bowen v. Dep't of Human Servs.*, 606 A. 2d 1051, 1053 (Me. 1992); *Watt v. Unifirst Corporation*, 2009 ME 47 ¶ 22 n. 4, 969 A. 2d 897, 903 n. 4. Thus, Maine courts apply the MHRA in accordance with federal anti-discrimination law. Title IX of the Education Amendment of 1972[9] "imposes an obligation on educational institutions receiving federal funds to

---

[7] The full text of subsection (7) is:

> An order to pay to the victim of unlawful discrimination, other than employment discrimination in the case of a respondent who has more than 14 employees, or if the commission brings an action on behalf of the victim, an order to pay to the victim, the commission or both, civil penal damages not in excess of $20,000 in the case of the first order under this Act against the respondent, not in excess of $50,000 in the case of a 2nd order against the respondent arising under the same subchapter of this Act and not in excess of $100,000 in the case of a 3rd or subsequent order against the respondent arising under the same subchapter of this Act, except that the total amount of civil penal damages awarded in any action filed under this Act may not exceed the limits contained in this subparagraph.

[8] Although required, exhaustion of administrative remedies is not an issue in this case. See 5 M.R.S.A. § 4621.

[9] "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681.

5

refrain from denying educational opportunities on the basis of sex." *Lakshman v.*
*University of Maine System*, 328 F. Supp. 2d 92, 115 (D. Me. 2004).

In *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992), the United
States Supreme Court unanimously concluded that Title IX authorized a high school
student who had been sexually harassed by a sports coach/teacher to recover damages
from the school district. In reaching this conclusion, the Court relied on the presumption
that Congress intends to authorize "all appropriate remedies" unless it expressly indicates
otherwise. 503 U.S. at 66. The Court also concluded that "Congress did not intend to
limit the remedies available in a suit brought under Title IX." 503 U.S. at 72. The
general rule since *Franklin* is that absent clear direction to the contrary by Congress, the
federal courts have the power to award any appropriate relief for intentional
discrimination. See, e.g., 503 U.S. at 75.

Similar conclusions can be reached in interpreting the MHRA, where the
Legislature expressly authorizes appropriate remedies and states that it does not intend to
limit the type of remedy or remedies that may be awarded, even though the Legislature
listed some remedies that may be considered. See 5 M.R.S.A. § 4613(2)(B).
However, Section 4613, in its broad permissive language, does not resolve what type of
monetary damages may be considered.

In this regard, the analogy between Title IX and the MHRA demonstrates its
limits. Compensatory damages are available for Title IX actions, but punitive damages
are not. *Barnes v. Gorman*, 536 U.S. 181, 184-87 (2002). In *Barnes*, the Supreme Court
relied on the fact that Title IX was enacted through the Spending Clause and found that

punitive damages were prohibited.[10] *Id.* The Court reasoned that in exchange for federal funds received, the recipient of the funds agreed to comply with federally imposed conditions. *Id.* The Court explained that Spending Clause legislation is in the nature of a contract and stated that a "funding recipient is generally on notice that it is subject not only to those remedies explicitly provided in the relevant legislation, but also to those remedies traditionally available in suits for breach of contract." *Id.* at 187. The Court found that a punitive damages award was inappropriate because "punitive damages, unlike compensatory damages and injunction, are generally not available for breach of contract." *Id.* Unlike Title IX, the MHRA is obviously not a Spending Clause enactment, and therefore, Title IX case law concerning punitive damages has little application. In fact, the Maine Legislature explicitly allowed civil penal damages in Section 4613(2)(B)(7).

Further complicating the damages analysis is the unique nature of this case. There are no caps in the education discrimination section of the MHRA, except of course the civil penal damages cap. Additionally, by the plain language of the statute, the caps in the employment discrimination provisions of the MHRA do not apply. See 5 M.R.S.A. § 4613(2)(B)(8).

With regard to caps, the evidence adduced at trial included evidence that ICC has a South Portland Campus with 30 employees and ICC's main campus is in Orange,

---

[10] In *Barnes*, the Supreme Court technically held that punitive damages were not permitted under Title VI, but then noted that Title XI is interpreted consistent with Title VI. *Id.* at 185.

7

California.[11] Additional evidence indicated that ICC also has five additional campuses in other locations in California, including Burbank, Riverside, West Covina, Carson and Sacramento, California, and that the South Portland campus is the smallest campus of the ICC system. A fair inference is that ICC has more than 30 employees at each of its campuses nationwide and more than 200 employees nationwide. Were this an employment discrimination case, which of course it is not, the total damages awarded would not exceed the cap for defendant employers of like size. See 5 M.R.S.A. § 4613(2)(B)(8)(e)(iii). This provides some indication that the total amount of damages was reasonable and not excessive.

Furthermore, ICC introduced no evidence whether this is the first or second order under the MHRA directed at this defendant. The cap on civil penal damages is contingent on a showing that this judgment is defendant's first or second violation of the MHRA, in order for the court to apply a cap of $20,000 or $50,000, respectively. 5 M.R.S.A. § 4613(2)(B)(7). For a third or subsequent violation of the MHRA, the cap remains at $100,000. *Id.* Contrary to defendant's assertion, the defendant "bears the burden of establishing the prerequisites for capping the award." *Hernandez-Miranda v. Empresas Diaz Masso, Inc.*, 651 F. 3d 167, 175-75 (1st Cir. 2011). ICC has failed to do that.

Regardless, the MHRA does not set a limit on remedies except to say it should be an appropriate remedy for that discrimination. Because the punitive damages award was $30,000 and well within the maximum for a civil penal damage cap of $100,000, this court denies this portion of the motion seeking to apply a cap of $20,000 on all damages.

---

[11] The parties dispute whether there are 30 or 50 employees on the Maine campus of ICC. Without a transcript the court cannot resolve this dispute. Suffice it to say that this court finds that ICC has more than 200 employees spread across its 7 campuses.

The jury found intentional discrimination; therefore, a $30,000 civil penal damage award is well within the evidence presented on this issue and acknowledges ICC's violation of the MHRA, and will deter ICC from further violations. This award does not result in excessive relief to Helwig, even when considered in the context of other relief provided. Similarly, the award of lost wages of $100,00 and an award of $150,000 in compensatory damages does not exceed the caps authorized in employment cases. These awards were based on sufficient evidence of lost future earnings and emotional distress as a result of sexual harassment and retaliation.

The court will again take up the issue of caps when addressing the issues raised by ICC in its motion for a new trial and/or a judgment notwithstanding the verdict.

## MOTION FOR NEW TRIAL AND/OR TO REDUCE OR MODIFY VERDICT OR JUDGMENT / FOR JUDGMENT NOTWITHSTANDING THE VERDICT

Defendant makes six arguments to support this motion: (1) the damages for lost wages were excessive, unauthorized and no evidence was introduced to warrant an award of "$150,000" (sic)[12]; (2) the court abused its discretion when it excluded a note in Helwig's handwriting dated October 16, 2008 on the grounds it had not been produced in discovery and the note should have been admitted for impeachment purposes; (3) the court erred in admitting evidence about third parties and their experience with the faculty member David Martin to show notice to the defendant; (4) the Maine Human Rights Act does not authorize a claim for sexual harassment or retaliation or a claim for lost wages in the context of an educational institution, and there was no evidence to support a causal link between the sexual harassment complaint in April and May of 2008 and termination in October 2008; (5) plaintiff's counsel improperly inflamed the jury by remarking "Mr.

---

[12] The lost wages award totaled $100,000.

9

Evans cannot do things he might otherwise do in California" and improperly argued that Mr. Evans was involved with the decisions concerning the sexual harassment complaint and the termination; and (6) there was no evidence to support a finding by the clear and convincing standard of malice or reckless indifference. Counsel for ICC did not request and submit a transcript of the trial for the court's consideration of these issues.

"The party moving for a new trial must show that it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." Harvey, *Maine Civil Practice* § 59.1 (citations omitted). The burden is on the moving party seeking the new trial. *Fuller v. Town of Searsport*, 543 A. 2d 361, 364 (Me. 1988). Defendant's claims cross over several categories, including insufficient evidence, prejudicial error in admitting or excluding certain evidence, award of damages excessive or manifest error of law. Where ICC claims the evidence is insufficient, the court must view the evidence in the light most favorable to the successful party. See *Binette v. Deane*, 391 A.2d 811, 813 (Me. 1978). In this circumstance, the moving party must show that the "jury verdict was so manifestly or clearly wrong that it is apparent that the conclusion of the jury was the result of prejudice, bias, passion, or a mistake of law or fact. The verdict must stand unless the record contains no credible evidence to support it." *Id.* Similarly, if the claim is that the jury's award is excessive the movant must show that the jury acted under some bias, prejudice, or improper influence, or has made some mistake of fact or law. *Provencher v. Faucher*, 2006 ME 59, ¶ 6, 848 A.2d 404, 406-07.

(1)  Lost Wages

Turning to ICC's first argument that the damages for lost wages were excessive, unauthorized and no evidence was introduced to warrant an award of $100,000, the court

10

rejects this argument. First, as the moving party, ICC has the burden of producing a record from which the court may review its arguments. ICC has failed to do so. ICC has also failed to meet its burden of establishing that Helwig did not mitigate her damages. There is evidence that she could not seek nursing-related jobs because she would have to report to future employers that she was terminated from ICC for violating the Professional Code of Conduct. Helwig also testified that her Crohn's disease intensified following her termination from ICC's program, that she is on SSDI and can only earn $9 per hour for 7 hours a week as a result of being on SSDI.

The MHRA is a remedial statute whose intent is to put the plaintiff in the position that she would have been but for the discrimination. ICC is a technical school where students take classes and participate in clinical programs. It is Helwig's performance in the clinical component that ICC claims caused it to terminate her education at ICC. Helwig performed very well in the strictly educational component. Being terminated from the program deprived Helwig the opportunity to become a nurse. There was testimony that students were promised that they would earn in their first year a salary twice their tuition of $25,000. There was also testimony that Helwig would have graduated in February 2009. Instead, ICC terminated her educational program and she was not able to work as a nurse earning $50,000 a year. From this evidence, the jury could reasonably have found that she suffered the loss of $100,000 in lost future wages that she would have earned but for her termination from the nursing school program.

Finally, an award of lost future earnings is a traditional common-law tort remedy, *Williams v. Pharmacia, Inc.*, 138 F.3d 944, 952 (7th Cir. 1998), and need not be

11

specifically authorized in order to be awarded under the MHRA. See 5 M.R.S.A. § 4613(2)(B).

(2)    Helwig's Note Dated October 16, 2008

ICC argues that the court abused its discretion when it excluded a note in Helwig's handwriting dated October 16, 2008 on the grounds it had not been produced in discovery and the note should have been admitted for impeachment purposes. ICC is quite accurate that the court excluded this note, but this was done after the court having found that ICC violated the discovery rules and had even sanctioned ICC for their failure to comply with discovery. The note dated October 16, 2008 was not a note that Helwig had kept in her records and was produced for the first time during the trial. It was well within the court's discretion to exclude this document even if it could have been used for impeachment purposes.

(3)    Third Party Testimony Concerning David Martin

ICC contends that the court erred in admitting evidence about third parties and their experience with the faculty member David Martin in order to show notice to the defendant. Helwig alleged that it was David Martin who had sexually harassed her and because of her complaints about this, ICC decided to retaliate against her and terminate her from the program. The court permitted testimony from Roseanne Lynch and Lisa Green about their experiences with David Martin. Their testimony about Martin's harassment went to motive and whether ICC was aware that sexual harassment was occurring.

ICC's defense was that they had just cause to terminate Helwig. Their testimony at trial however was that they did not believe Helwig and did nothing when she

complained about David Martin. They did not investigate her claims, concluded there was nothing to her claims and believed David Martin over Helwig. Because they could not corroborate Helwig's allegations, they did nothing. They knew there were sexual harassment allegations from at least two students, but they saw no reason to doubt Martin's credibility. According to Helwig, when she asked Brody whether ICC was doing anything about David Martin, Brody told her "to get over it." Similarly, Lynch testified that she complained to Brody about Martin's harassment cornering her and another student in the shower and also complained about Martin's sexual comments. Brody's response was that she was a "troublemaker" and to "suck it up." Lynch's testimony, along with that of Green, was properly admitted on the issue of ICC's notice and knowledge of allegations against Martin.

(4)    Sexual Harassment and Retaliation under the MHRA

ICC argues that the Maine Human Rights Act does not authorize a claim for sexual harassment or retaliation or a claim for lost wages in the context of an educational institution, and there was no evidence to support a causal link between the sexual harassment complaint in April and May of 2008 and termination in October 2008.

ICC's claim that the MHRA does not authorize a claim for sexual harassment and retaliation is without any merit. The MHRA prohibits sexual discrimination in both employment and education. 5 M.R.S.A. §§ 4571, 4601. Sexual harassment is a form of discrimination based on sex. See, e.g., *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 22, 969 A. 2d 897, 902-03. Furthermore, the MHRA prohibits retaliation against an individual "because that individual has opposed any act or practice that is unlawful under this Act." 5 M.R.S.A. § 4633.

13

There was evidence from which the jury could reasonably infer that the decision to terminate Helwig was because of her earlier complaints against Martin and ICC's failure to investigate the claims. Moreover, the decision to terminate did not occur until *after* Helwig told Brody she would not meet with Brody without her attorney present and *after* ICC received a copy of Helwig's MHRC complaint.

(5)     ICC's Counsel

ICC next claims that plaintiff's counsel improperly inflamed the jury by remarking "Mr. Evans cannot do things he might otherwise do in California" and improperly argued that Mr. Evans was involved with the decisions concerning the sexual harassment complaint and the termination. Without a transcript, the court cannot determine the context in which plaintiff's counsel might have referred to ICC's counsel being from California. However, there was substantial evidence that throughout the process, Brody and Michaud passed information along to the president of ICC and ICC's attorney in California for their review and advice. There was also evidence presented that they consulted with their attorney Neil Evans, Esquire. There was further testimony that Helwig's appeal was forwarded to counsel in California and that Neil Evans responded in late 2008 advising Helwig that her letter of appeal was under review and that he would get back to her. No response was ever forthcoming.

(6)     Reckless Indifference

Finally, ICC claims there was no evidence to support a finding of malice or reckless indifference by the clear and convincing standard. Again, without a transcript the court cannot fully respond to this allegation. However, the jury found that ICC acted with malice or reckless disregard of the rights of Helwig. There is the evidence discussed

14

above, which more than supports a finding of reckless disregard when ICC did not take seriously Helwig's or the other students allegations against Martin, saw no reason to disbelieve Martin and conduct an investigation, and then advised Helwig to get over it. This evidence alone is sufficient for a reasonable jury to find that ICC acted with reckless disregard.

In short, this court concludes that ICC has failed to meet its burden of showing that it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done.

It is hereby ORDERED:

The motion regarding caps on damages and the motion for a new trial and/or to reduce or modify the verdict or judgment and for judgment notwithstanding the verdict are DENIED.

Date: February 9, 2012

Joyce A. Wheeler, Justice

Plaintiff-Guy Loranger Esq.

Defendant-Visiting Attorney Neil C Evans
        Esq. (CA)
Local Counsel-Jen-Peter Bergen, Esq.

STATE OF MAINE
CUMBERLAND, ss

AIMEE HELWIG,

     Plaintiff

v.

INTERCOAST CAREER INSTITUTE,

     Defendant

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-09-225
JAW - CUM - 9/16/2013

ORDER ON MOTION FOR
ATTORNEY FEES AND COSTS

Cum...
SEP 10 ...
RECEIVED

This matter is before the Court on plaintiff's request for attorney's fees and litigation expenses following a successful jury trial in June 2011.

**Background**

Plaintiff filed her complaint against Intercoast in April 2009. In 2010, Ms. Helwig filed for Chapter 7 Bankruptcy. The trustee of her estate, John C. Turner, retained Ms. Helwig's attorney, Guy Loranger, to continue the litigation in this case. On June 30, 2011, the following Judgment was entered in favor of the Plaintiff:

> On the claim for retaliation: $100,000.00
> On the claim for emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life: $150,000.00
> On the claim for punitive damages: $30,000.00
> On the claim for breach of contract: $20,000.00
> All with pre-judgment interest at the rate of 3.40% and post-judgment interest at the rate of 6.30%, with costs

Defendant appealed the judgment, which was affirmed by the Law Court on January 29, 2013. *Helwig v. Intercoast Career Institute*, Mem. 13-5 (Jan. 29, 2013). On March 15, 2013, the plaintiff filed an application for attorney fees and costs.

**Discussion**

General Calculation: The Lodestar

The Maine Human Rights Act allows a prevailing party to collect reasonable costs and attorney fees, provided the plaintiff first filed with the Maine Human Rights Commission. 5 M.R.S.A. §§ 4614, 4622 (2012). In her complaint, the plaintiff indicated that she filed with the commission and was issued a right to sue letter. (Compl. ¶ 19.) The court therefore has discretion to award plaintiff, as the prevailing party, attorney fees and costs in this case. The Law Court will review the Superior Court's calculation of a reasonable fee only for abuse of discretion. *Poussard v. Commercial Credit Plan Inc. of Lewiston*, 479 A.2d at 884 (Me. 1984).

In determining an attorney fee award, courts usually employ the lodestar calculation, which "is the product of the number of hours appropriately worked times a reasonable hourly rate or rates." *Hutchison ex. rel. Julien v. Patrick*, 636 F.3d 1, 13 (1st Cir. 2011). The court should subtract hours that are excessive or unnecessary from the calculation. *Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir. 1992). In *Mancini v. Scott*, the Law Court laid out the factors to guide a trial court's calculation of a reasonable fee:

> (1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Mancini v. Scott*, 2000 ME 19, ¶ 10, 744 A.2d 1057 (quoting *Poussard v. Commercial Credit Plan Inc. of Lewiston*, 479 A.2d 881, 884 (Me. 1984).

2

This lodestar figure "may be adjusted up or down to reflect Plaintiff's degree of success in the litigation." *Chaloult v. Interstate Brands Corp.*, 296 F. Supp.2d 2, 4 (D. Me. 2004). In *Chaloult*, for example, the court adjusted the fee calculation down because the attorney only received nominal damages and not compensatory damages for the client. *Id.*

Gross Judgment vs. Gross Amount Collected

Defendant argues that plaintiff's recovery is limited by the bankruptcy court order approving the trustee's application to retain Mr. Loranger. Defendant contends that Mr. Loranger cannot collect more than 33 1/3% of the judgment entered pursuant to the bankruptcy order. Plaintiff points out that the bankruptcy order references the trustee's application, which states:

> Guy D. Loranger of Nichols, Webb & Loranger, PA, has indicated he would continue the litigation and negotiations under the same Contingent Fee Agreement he signed with the debtor on or about September 30, 2008, more specifically that Attorney Loranger would receive 33 1/3% of the gross amount collected.

(Def.'s Exhibit A). Plaintiff argues that the "gross amount collected" includes the judgment as well as reasonable costs and attorney's fees.

In *Blanchard v. Bergeron*, the U.S. Supreme Court, in construing the statute authorizing awards of attorney fees in federal civil rights cases, found that a contingency fee agreement may aid in determining the reasonableness of the attorney's fees award, however, "a contingent-fee contract does not impose an automatic ceiling on an award of attorney's fees." *Blanchard v. Bergeron*, 489 U.S. 87, 93 (1989). In *Venegas v. Mitchell*, the Supreme Court further clarified the relationship between an attorney's fee award and a contingent fee agreement:

3

In sum, §1988 controls what the defendant must pay, not what the prevailing party must pay his lawyer. What a plaintiff may be bound to pay and what an attorney is free to collect under a fee agreement are not necessarily measured by the "reasonable attorney's fee" that a defendant must pay pursuant to a court order. Section 1988 itself does not interfere with the enforceability of a contingent-fee contract.

*Venegas v. Mitchell*, 495 U.S. 82, 90 (1990). Thus, at least under federal law, the existence of a contingency fee arrangement between the plaintiff and his attorney does not limit recovery of attorney's fees.

Defendant's argument that the plaintiff is not entitled to seek attorney's fees is not persuasive. Not only does the agreement referenced in the bankruptcy order state "gross amount collected" rather than gross judgment as the defendant contends, it is the party and not the attorney who is entitled to the attorney's fees award. *Venegas*, 495 U.S. at 87-88. Thus, it is Mr. Loranger's client (or the bankrupt's estate) and not Mr. Loranger who is entitled to the fees, if any, in this case. Mr. Loranger's contingent fee agreement with his client does not preclude the Court from awarding reasonable attorney's fees based on a lodestar calculation.

Multiplier

In very rare cases of exceptional success, the court may award an enhancement to the lodestar figure. *See Blum v. Stenson*, 465 U.S. 886, 897 (1984) ("[A]n enhanced award may be justified 'in some cases of exceptional success.'") (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 335 (1983). In *Perdue v. Kenny A. ex rel. Winn*, the Supreme Court explained that the novelty of the issues presented in the case and the quality of the attorney's performance should generally not be used to adjust the lodestar figure because these factors are usually reflected in the calculation of the reasonable rate itself. *Perdue v. Kenny A. ex rel Winn*, 559 U.S. 542, 553 (2010). There is a strong presumption that the

4

lodestar figure is correct and a fee applicant must point to "specific evidence" to support enhancement of the award. *Id.* at 552-53.

Mr. Loranger points to the outstanding results obtained in this case to justify a multiplier. He states that this is the largest ever jury award in an employment discrimination case in Maine and that it is very rare for a jury to award punitive damages. Mr. Loranger also argues that this case was undesirable because the defendant did not offer to settle the case for any reasonable amount and that plaintiff had spoken with other attorneys who did not accept her case. In addition, he points to the novelty and complexity of the issues related to the educational setting of the case.

This case may fall under the very narrow exception to the general rule that the lodestar figure is the correct award. Mr. Loranger is asking for a 1.75 multiplier[1] of the attorney's fees award. A 1.75 multiplier seems to be at the upper end of what has been awarded in civil rights cases. *See Barnes v. City of Cincinnati*, 401 F.3d 729, 746 n.4 (6th Cir. 2005) ("[D]istrict courts should recognize that this figure, (1.75), is near the upper end of what we consider 'reasonable.'").

**Conclusion**

Mr. Loranger's fee request at $300/hour for 326.60 hours is reasonable. I am not convinced of the need for a multiplier in this case, especially since Mr. Loranger is going to receive 1/3 of the total amount collected (the judgment plus the attorney's fees award). Federal case law from the Supreme Court and the First Circuit indicates that a multiplier is almost never appropriate because most of the factors warranting an increase in the fee

---

[1] In his brief, Mr. Loranger asks for a multiplier of 1.75%. Based on his calculations, however, it is clear that he is asking the court to multiply the attorney's fees award by 1.75 and not to increase it by 1.75%.

5

are already taken into account during the initial calculation of the reasonable fee. Although this case was a great success for the plaintiff and the case may in fact have been very undesirable from the outset, I nevertheless find that the basic hourly rate is a fair and reasonable fee without a multiplier.

The entry is:

1.    Intercoast is Ordered to pay Plaintiff the following litigation expenses and attorney's fees within 30 days of this order:

| | | |
|---|---|---|
| Attorney's Fees | $ | 97,980 |
| Expenses | $ | 6,239.42 |
| | | |
| TOTAL: | $ | 104,219.42 |

2.    Plaintiff's counsel is entitled to 331/3 % of the gross amount collected, including the judgment entered on June 30, 2011 and attorney's fees and expenses awarded in this Order of today.

Date: 9|18|3

Joyce A. Wheeler
Justice, Superior Court

Plaintiff Helwig-Guy Loranger Esq
Defendant Intercoast-Visiting Attorney Neil C Evans Esq (CA)

6