MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2014 ME 8
Docket:        Cum-11-591
Argued:        May 8, 2012
Decided:       January 23, 2014

Panel:         SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and
               JABAR, JJ.
Majority:      SAUFLEY, C.J., and ALEXANDER, SILVER, and MEAD, JJ.
Concurrence:   ALEXANDER, J.
Dissent:       LEVY, GORMAN, and JABAR, JJ.

NICOLE DUSSAULT

v.

RRE COACH LANTERN HOLDINGS, LLC, et al.

SILVER, J.

[¶1]   Nicole Dussault appeals from a summary judgment entered in the

Superior Court (Cumberland County, *Cole, J.*) in favor of RRE Coach Lantern

Holdings, LLC, and Resource Real Estate Management, Inc. (collectively, Coach

Lantern).   Dussault claims that Coach Lantern's policy of not including in its

standard lease a tenancy addendum that binds the landlord to the requirements of

the federal government's Section 8 Housing Choice Voucher Program constitutes

unlawful discrimination on the basis of her status as a public assistance recipient in

violation of 5 M.R.S. § 4582 (2007)[1] of the Maine Human Rights Act (MHRA),

5 M.R.S. §§ 4551-4634 (2007).   She also argues that the court erred by granting

---

[1]  Title 5 M.R.S. § 4582 has been repealed and replaced by P.L. 2011, ch. 613, §§ 11-12 (effective
Sept. 1, 2012) (codified at 5 M.R.S. § 4581-A (2013)), but the change does not affect this appeal.  The
relevant language of the new section 4581-A is substantially identical to that of prior section 4582.

2

Coach Lantern's motion for summary judgment and denying her cross-motion for summary judgment based on three theories of discrimination: direct evidence, disparate treatment, and disparate impact. We disagree and affirm the judgment.

## I. FACTUAL AND LEGAL BACKGROUND

[¶2] The following facts are drawn from the summary judgment record and are not disputed by the parties. Nicole Dussault and her three children became homeless in June 2008 following a foreclosure on Dussault's home. On July 14, 2008, Dussault was issued a voucher pursuant to the Section 8 Housing Choice Voucher Program by Avesta Housing, a nonprofit organization that administers the federal voucher program as a contract agent for the Maine State Housing Authority.[2] Through the voucher program, the Housing Authority provides assistance to people with low incomes by subsidizing rent. The Housing Authority pays a portion of the voucher recipient's rent each month directly to the landlord for a unit of the recipient's choosing. *See* 24 C.F.R. § 982.1 (2013). The Housing Authority calculates an amount of rent for which the recipient is responsible, which is usually equal to thirty percent of the recipient's adjusted

---

[2] The federal program originated with section 8 of the United States Housing Act of 1937, P.L. 75-412, 50 Stat. 888, as amended by the Housing and Community Development Act of 1974, P.L. 93-383, § 201(a), 88 Stat. 633, 662-666, and is now codified at 42 U.S.C.A. § 1437f (West, Westlaw through P.L. 113-65 (excluding P.L. 113-54) approved 12-20-13), with associated regulations at 24 C.F.R. §§ 982.1-.643 (2013). It is administered by the United States Department of Housing and Urban Development (HUD) in conjunction with state and local housing agencies. *See* 24 C.F.R. §§ 982.1, 982.3.

income as defined by statute. *See* 42 U.S.C.A. §§ 1437a(b)(5), 1437f(o)(2)(A)-(B) (West, Westlaw through P.L. 113-65 (excluding P.L. 113-54) approved 12-20-13). Federal law explicitly makes landlords' participation in the voucher program voluntary. *See* 24 C.F.R § 982.302(b) (2013) ("If the family finds a unit, *and the owner is willing to lease the unit under the program*, the family may request [Housing Authority] approval of the tenancy." (emphasis added)).

[¶3] Dussault sought housing in Scarborough in order to maintain her son's placement in the school system there. Through Craigslist, Dussault found a listing for a three-bedroom apartment in the Coach Lantern Apartments in Scarborough with an advertised rent that was within the voucher program limits. The apartment is owned by RRE Coach Lantern Holdings, LLC, of which Resource Real Estate Management, Inc., is an affiliate.

[¶4] On August 5, 2008, Dussault called Coach Lantern to inquire about renting the apartment. Dussault alleges that after she disclosed that she would be using a voucher to pay the rent, she was told that Coach Lantern does not accept vouchers. She alleges that her caseworker at Avesta Housing was told the same thing by Coach Lantern when the caseworker inquired on Dussault's behalf. Approximately two weeks later Dussault again called Coach Lantern to inquire about the apartment, but she did not mention that she would be using a voucher. After arranging an appointment and being shown the apartment, Dussault was

4

given a rental application. A Coach Lantern employee encouraged her to fill it out. Two days later a Coach Lantern representative called Dussault to ask if she planned to submit the application. Dussault did submit an application, and on it she disclosed that she would be using a voucher. Dussault qualified for an apartment and "was accepted."

[¶5]  Dussault's Avesta caseworker sent Coach Lantern a "landlord packet" indicating that in order for Dussault to be able to use her voucher, Coach Lantern would have to include a HUD tenancy addendum in her lease. Federal regulations require any landlord that accepts a housing voucher to include the tenancy addendum in its lease. 24 C.F.R. § 982.308(f) (2013). The addendum sets forth the program requirements for participating landlords and tenants. *Id.*; *see also* 24 C.F.R. §§ 982.308-.310 (2013). The caseworker informed Coach Lantern that paperwork would need to be filled out before a HUD-mandated property inspection could take place, and that the paperwork and inspection process "could take a couple of weeks."

[¶6]  Coach Lantern, through its attorney, contacted Avesta Housing by letter dated September 3, 2008, to state its "problem with the inclusion of a Tenancy Addendum with [the standard] lease" and to see whether it could rent to Dussault without including the addendum in her lease. The letter stated, "I wish to make it absolutely clear that my client is not refusing to rent to [Dussault]

primarily because she is a recipient of public assistance," but because "[t]he addendum includes more restrictive rights and obligations on the landlord th[a]n the standard lease that they use, and my client does not wish to be bound by these more restrictive obligations." Avesta Housing replied by email dated September 12, 2008, that Coach Lantern could not rent to Dussault without including the addendum.

[¶7] Coach Lantern is unwilling to include the addendum in any of its leases. Specifically, Coach Lantern finds it unacceptable that pursuant to the addendum the landlord agrees (1) to maintain the unit and premises in accordance with the housing quality standards set by the Housing Authority; (2) not to raise the rent during the initial term of the lease; (3) to charge a "reasonable" rent, as determined by the Housing Authority in accordance with HUD requirements, during the lease term; (4) not to evict the tenant or terminate the lease solely because the Housing Authority has failed to pay the subsidized portion of the rent; (5) not to evict a tenant who is a victim of domestic violence based on acts of domestic violence committed against her, unless the landlord can demonstrate an actual and imminent threat to other tenants or employees; (6) to open the premises to inspection by a Housing Authority inspector at the beginning of the lease, upon any complaint by the tenant, or after the landlord has remedied a problem identified by an inspector in a prior inspection; and (7) to notify the Housing

6

Authority at least sixty days prior to any rent increase.

[¶8] Dussault was unable to afford the apartment without using the voucher. Because she could not use the voucher unless Coach Lantern included the addendum in her lease, she did not rent the apartment. She could not find housing in Scarborough and ultimately moved to South Portland. Dussault does not intend to seek housing at any Coach Lantern property in the future.

## II. PROCEDURAL BACKGROUND

[¶9] In November 2008, Dussault filed a complaint with the Maine Human Rights Commission (Commission), alleging that Coach Lantern's policy of refusing to include the HUD tenancy addendum in her lease, and therefore its refusal to participate in the voucher program, constitutes discrimination against Dussault on the basis of her status as a public assistance recipient in violation of the MHRA. After an investigation, the Commission voted unanimously at a hearing on April 13, 2009, that there were reasonable grounds to believe that Coach Lantern discriminated against Dussault because of her status as a recipient of public assistance.

[¶10] Dussault then filed a complaint in the Superior Court seeking declaratory and injunctive relief and damages. Coach Lantern filed a motion for

summary judgment and Dussault filed a cross-motion.[3] The court granted Coach Lantern's motion and denied Dussault's motion, ruling in favor of Coach Lantern on each of three theories of discrimination. First, the court determined that there was no direct evidence of discrimination, and thus declined to perform a mixed-motive analysis. Next, the court concluded that Dussault failed to meet her burden, as part of the three-step, burden-shifting test that applies when there is no direct evidence of discrimination, to produce sufficient evidence that Coach Lantern's proffered reasons for refusing to participate in the voucher program were pretextual. Finally, in performing a discriminatory impact analysis, the court concluded that Coach Lantern's policy affects recipients of public assistance more harshly than housing applicants who do not intend to use vouchers, but that the policy is justified by a business necessity.

[¶11] Dussault timely appealed.

### III. DISCUSSION

A.  Standard of Review

[¶12] We review the court's interpretation and application of the MHRA de novo. *See Russell v. ExpressJet Airlines, Inc.*, 2011 ME 123, ¶ 16, 32 A.3d 1030. "We review the court's ruling on cross-motions for summary

---

[3] Dussault withdrew her request for injunctive relief in her motion for summary judgment, as she does not plan to seek housing at Coach Lantern properties in the future.

8

judgment de novo . . . ." *F.R. Carroll, Inc. v. TD Bank, N.A.*, 2010 ME 115, ¶ 8, 8 A.3d 646. "Summary judgment is appropriate if the record reflects that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law." *Id.* (quotation marks omitted).

B.     The Maine Human Rights Act

[¶13]   The MHRA declares that individuals have a civil right to "[t]he opportunity . . . to secure decent housing in accordance with [their] ability to pay, and without discrimination because of race, color, sex, sexual orientation, physical or mental disability, religion, ancestry, national origin or familial status." 5 M.R.S § 4581.[4]   Although the MHRA does not reference status as a recipient of public assistance in this declaration, *see id.*, the MHRA does provide certain protections to public assistance recipients.  Section 4582 provides in relevant part:

> It is unlawful housing discrimination, in violation of this Act . . .
>
> [f]or any person furnishing rental premises or public accommodations to refuse to rent or impose different terms of tenancy to any individual who is a recipient of federal, state or local public assistance, including medical assistance and housing subsidies primarily because of the individual's status as recipient . . . .

5 M.R.S. § 4582.  Section 4583, however, provides in relevant part:

---

[4]   Title 5 M.R.S. § 4581 has since been amended by P.L. 2011, ch. 613, § 10 (effective Sept. 1, 2012) (codified at 5 M.R.S. § 4581 (2013)), but the change does not affect this appeal.

Nothing in this Act may be construed to prohibit or limit the exercise of the privilege of every person and the agent of any person having the right to sell, rent, lease or manage a housing accommodation to set up and enforce specifications in the selling, renting, leasing or letting or in the furnishings of facilities or services in connection with the facilities that are consistent with business necessity and are not based on the race, color, sex, sexual orientation, physical or mental disability, religion, country of ancestral origin or familial status of or the receipt of public assistance payments by any prospective or actual purchaser, lessee, tenant or occupant.

5 M.R.S. § 4583. Together these sections establish that a landlord may not refuse to rent to, or impose different terms of tenancy on, a recipient of public assistance who is an otherwise-eligible tenant primarily on the basis of that person's status as a recipient unless the landlord can demonstrate a business necessity that justifies the refusal.

[¶14] In construing a statute, we seek to give effect to the Legislature's intent. *See Eagle Rental, Inc. v. State Tax Assessor*, 2013 ME 48, ¶ 11, 65 A.3d 1278. We look beyond the plain language of the statute to other indicia of legislative intent only if the statute is ambiguous. *See id.*; *Fuhrmann v. Staples the Office Superstore E., Inc.*, 2012 ME 135, ¶ 23, 58 A.3d 1083. The only discrimination that the MHRA prohibits with respect to public assistance recipients is "refus[al] to rent or impos[ition of] different terms of tenancy" based primarily on a person's status as a recipient. 5 M.R.S. § 4582. This language stands in contrast to the broader prohibition against housing discrimination on other bases,

which makes it a violation of the MHRA to "refuse to show or refuse to sell, rent, lease, let *or otherwise deny to or withhold from* any individual housing accommodation because of the race or color, sex, sexual orientation, physical or mental disability, religion, ancestry, national origin or familial status of the individual." *Id.* (emphasis added).

[¶15]   We previously construed the MHRA's prohibition of "unlawful housing discrimination" based on receipt of public assistance in *Catir v. Commissioner of the Department of Human Services*, 543 A.2d 356, 357-58 (Me. 1988).  In *Catir*, a nursing home that had accepted state and federal Medicaid reimbursement stopped participating in the program and informed residents that it would no longer keep residents who were unable to pay the higher, private rate. *Id.* at 357.   Residents receiving Medicaid sued, seeking a declaration that the nursing home was obligated to accept Medicaid reimbursement. *Id.*   We upheld summary judgment for the nursing home, reasoning that it was not unlawful discrimination for the nursing home to stop participating in the Medicaid program and to require the residents receiving Medicaid to pay the same rate as residents not receiving Medicaid. *Id.* at 357-58.   We concluded that the nursing home had not "refuse[d] to rent or impose[d] different terms of tenancy" on the Medicaid recipients because the record showed that, by refusing to accept the lower Medicaid payment, the nursing home merely "subjected the [Medicaid] recipients

to the same terms of tenancy offered to any other individual." *Id.* at 357-58 (first and second alterations in original) (quotation marks omitted).

[¶16]  Here, as in *Catir,* the undisputed facts demonstrate that Coach Lantern did not "refuse to rent [to] or impose different terms of tenancy" on Dussault. Rather, Coach Lantern was willing to, and in fact did, offer Dussault the apartment, and was willing to rent to her after learning of her status so long as it could do so without including the tenancy addendum.  In essence, Coach Lantern offered to rent the apartment to Dussault on "the same terms of tenancy offered to any other individual."  *Id.* at 358.  A landlord does not violate the MHRA by offering apartments to recipients of public assistance on the same terms as it offers apartments to other potential tenants.  *See id.*

[¶17]  Even if we were convinced that Coach Lantern's policy of declining to include the tenancy addendum in Dussault's lease constituted a refusal to rent or imposition of different terms of tenancy within the meaning of section 4582, the undisputed facts show that Coach Lantern's refusal to include the addendum was not "primarily because of [Dussault's] status as recipient," but rather because Coach Lantern did not wish to bind itself to the terms of the tenancy addendum. The term "status," although not defined in the MHRA, is commonly defined as "[a] person's legal condition, whether personal or proprietary; the sum total of a person's legal rights, duties, liabilities, and other legal relations, or any particular

group of them separately considered." *Black's Law Dictionary* 1542 (9th ed. 2009). To the extent that there is any ambiguity in the meaning of "status," the legislative history of the MHRA makes clear that the statute was meant to proscribe refusals to rent "made not with reference to the tenant's personal responsibility and integrity . . . but only on the general misapprehension that a family on public assistance is automatically an undesirable tenant." L.D. 327, Statement of Fact (107th Legis. 1975).

[¶18] We recognize the MHRA's purpose to protect public assistance recipients' rights to secure decent housing. We will not, however, read into the MHRA a mandate that landlords accept terms of tenancy that are otherwise required only if the landlord chooses to participate in a voluntary federal program. *See* 24 C.F.R § 982.302(b) (noting that the voucher program is voluntary); *see also Edwards v. Hopkins Plaza Ltd. P'ship*, 783 N.W.2d 171, 176-77 (Minn. Ct. App. 2010) (concluding that the voucher program is voluntary pursuant to state and federal law).

[¶19] We are limited by the language that the Legislature has enacted, and may not substitute our policy judgment for that of the Legislature. *See Edwards*, 783 N.W.2d at 179 ("[T]he issue of ensuring affordable housing availability is an issue for the . . . Legislature or the United States Congress, which have the power to establish policy and enact laws in this area."). The Legislature has not required

landlords to accept Section 8 vouchers. Although the Legislature has considered a bill that would have effectively required landlords to participate in the voucher program, it has not, to date, made this voluntary program mandatory in Maine. *See* L.D. 685, § 2 (123rd Legis. 2007) (proposing an amendment to the MHRA forbidding discrimination against recipients of public assistance "because of any requirement of such a public assistance program"); Comm. Amend. A to L.D. 685, No. S-162 (123rd Legis. 2007) (removing the language regarding discrimination based on the requirements of public assistance programs from the bill).

## C.  Summary Judgment

[¶20]  In deciding the parties' cross-motions for summary judgment, the Superior Court ruled in favor of Coach Lantern on each of three different theories of discrimination: direct evidence, disparate treatment, and disparate impact. We address each theory in light of the interpretation of the MHRA that we have now articulated.

### 1.  Direct Evidence

[¶21]  Courts have historically addressed claims of direct evidence of discrimination through a "mixed-motive" analysis. *See Patten v. Wal-Mart Stores E., Inc.*, 300 F.3d 21, 25 (1st Cir. 2002). Pursuant to that analysis, a plaintiff must first offer evidence that her status as a public assistance recipient was a "motivating factor" in the landlord's refusal to rent to her. *See id.* (emphasis

omitted). The defendant landlord then bears the burden of producing evidence that it would have refused to rent to the potential tenant even if she were not a recipient of public assistance. *See id.* Because the undisputed facts demonstrate that, in declining to include the tenancy addendum in its lease, Coach Lantern did not "refuse to rent or impose different terms of tenancy" on Dussault based primarily upon her status as a recipient of public assistance, Dussault has failed to present a prima facie case of discrimination on a direct evidence theory.[5]

2.     Disparate Treatment

[¶22] When a plaintiff makes a disparate treatment claim at the summary judgment stage, a three-step, burden-shifting test applies. *See Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 14, 45 A.3d 722. First, the plaintiff must establish a prima facie case of discrimination. *See id.* Second, if the plaintiff has met her burden in the first step, the landlord must present evidence of a legitimate, non-discriminatory reason for the adverse action. *See id.* ¶ 15. Third, if the landlord meets its burden in the second step, the plaintiff must present evidence that the landlord's proffered reason is pretextual or untrue. *See id.* This analysis addresses the parties' burdens of production, not persuasion. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08, 521 (1993).

---

[5] Given this conclusion, we need not address the continuing vitality of the "mixed-motive" analysis in light of *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 173-80 (2009) (interpreting the Age Discrimination in Employment Act's bar on discrimination "because of" age as requiring a showing of but-for causation, rather than a showing that age was simply a motivating factor).

[¶23]   Here again, Dussault has failed to establish a prima facie case, because the undisputed facts show that Coach Lantern did not "refuse to rent or impose different terms of tenancy" on Dussault based primarily upon her status as a recipient of public assistance.  *See Lindsay v. Yates*, 578 F.3d 407, 415 (6th Cir. 2009) (requiring the plaintiff in a housing discrimination case to provide prima facie evidence that he or she applied for and was denied a housing accommodation); *McDonald v. Coldwell Banker*, 543 F.3d 498, 503, 505 (9th Cir. 2008) (same); *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003) (same); *see also Cookson v. Brewer Sch. Dep't*, 2009 ME 57, ¶ 14, 974 A.2d 276 (discussing the requirement of a prima facie showing of discrimination in the employment context).

3.    Disparate Impact

[¶24]   We evaluate claims of disparate impact in the employment context using a similar three-step, burden-shifting analysis.  *See Me. Human Rights Comm'n v. City of Auburn*, 408 A.2d 1253, 1264-65, 1268 (Me. 1979).  First, the plaintiff must establish a prima facie case of disparate impact by identifying a facially neutral practice that affects one group more harshly than another.  *Id.* at 1264.  Second, if the plaintiff meets her burden in the first step, the defendant must present prima facie evidence that its practice is justified by a business necessity.  *Id.* at 1265.  Finally, if the defendant meets its burden in the second step, the

16

plaintiff must present prima facie evidence that the defendant's proffered justification is pretextual or that other practices would have a less discriminatory impact. *Id.* at 1268.

[¶25] Nothing in the language of the MHRA suggests, however, that it imposes disparate impact liability on a landlord for discrimination against an individual because of the individual's status as a recipient of public assistance. *See Smith v. City of Jackson*, 544 U.S. 228, 233-40 (2005) (concluding that the Age Discrimination in Employment Act created disparate impact liability because its text "focuses on the *effects* of the action on the employee rather than the motivation for the action of the employer").[6]  As we have noted, the only discrimination that the MHRA prohibits with respect to public assistance recipients is "refus[al] to rent or impos[ition of] different terms of tenancy" based primarily on a person's status as a recipient.  5 M.R.S. § 4582.

[¶26] Dussault argues that section 4583 incorporates disparate impact liability into the housing discrimination provisions of the MHRA, and that the legislative history of the statute supports this contention.  This argument, however, finds no support in the language of section 4583.  *See Eagle Rental*, 2013 ME 48, ¶ 11, 65 A.3d 1278 (noting that we do not consider legislative history if a statute is

---

[6]  Although none of the parties or amici have directly argued that the MHRA does not impose disparate impact liability on a landlord for discrimination against an individual because of the individual's status as a recipient of public assistance, a necessary first step in our analysis is to determine whether such liability exists.

unambiguous). Nothing in the language of section 4583 broadens the MHRA's protections of recipients of public assistance; rather, section 4583 *limits* those protections by providing landlords with a defense of business necessity for conduct that might otherwise violate section 4582. *See Smith*, 544 U.S. at 251-52 (O'Connor, J., concurring) (opining that, contrary to the plurality opinion, a provision in the Age Discrimination in Employment Act permitting discrimination based on "reasonable factors other than age" did not create disparate impact liability, but rather created a "safe harbor" for defendants (emphasis omitted) (quotation marks omitted)). We therefore conclude, as a matter of law, that the MHRA, as currently established by the Maine Legislature, does not create disparate impact liability in the context of claims of housing discrimination based on a landlord's decision not to participate in the voluntary voucher program established by Section 8.

[¶27] In reaching the opposite conclusion, the dissent relies heavily on the federal courts' interpretation of the Fair Housing Act (FHA), 42 U.S.C.A. §§ 3601-3631 (West, Westlaw through P.L. 113-65 (excluding P.L. 113-54) approved 12-20-13). Unlike the MHRA, however, the FHA does not prohibit housing discrimination on the basis of an individual's status as a recipient of public assistance. *Id.* § 3604(a)-(e) (prohibiting housing discrimination "because of race, color, religion, sex, familial status, or national origin"). Moreover, the FHA more

broadly defines the discrimination it prohibits, making it a violation of the Act "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny, a dwelling to any person*" because of their protected status. *Id.* § 3604(a) (emphasis added). This language stands in contrast to the MHRA's relatively narrow prohibition of "refus[al] to rent or impos[ition of] different terms of tenancy" based primarily on a person's status as a recipient of public assistance. 5 M.R.S. § 4582; *see also Smith*, 544 U.S. at 233-40. Although we look to federal law for guidance in interpreting the MHRA, we "must not abdicate [our] function of conclusively resolving matters of purely state law." *Fuhrmann*, 2012 ME 135, ¶ 27, 58 A.3d 1083 (alteration in original) (quotation marks omitted). This is particularly true where Congress has taken pains to identify the voucher program as entirely voluntary.

[¶28] The dissent's interpretation of section 4583 would effectively compel Maine's landlords to participate in a voluntary federal housing subsidy program or risk having to litigate whether their decision not to participate is based on a "business necessity." For many of Maine's small or mid-sized landlords, the expense and uncertainty of litigation simply may not be an option. Had the Legislature intended to impose this requirement on landlords, it would have done so clearly, particularly in light of the fact that it would have effectively overruled

our holding in *Catir*. *See* 543 A.2d at 357-58 (holding that a nursing home did not violate the MHRA by offering housing to Medicaid recipients on "the same terms of tenancy offered to any other individual"). "In the absence of *clear and explicit* statutory language showing that the legislature intended a statute to modify case law, we will not interpret a statute to effect such a modification." *Caron v. Me. Sch. Admin. Dist. No. 27*, 594 A.2d 560, 563 (Me. 1991) (emphasis added).

[¶29] The dissent suggests that our interpretation of the MHRA allows landlords to avoid liability by simply alleging business necessity rather than proving it. Dissenting Opinion ¶ 58. We do not so hold. Rather, because we conclude that sections 4582 and 4583 do not create disparate impact liability in the context of claims of housing discrimination based on a landlord's decision not to accept the tenancy addendum in order to participate in the voucher program, and because Dussault has not otherwise made out a prima facie case of housing discrimination, we do not reach the issue of business necessity.

D.    Conclusion

[¶30] Because the undisputed facts show that Coach Lantern did not discriminate against Dussault in violation of the MHRA, we affirm the summary judgment in favor of Coach Lantern and the denial of Dussault's cross-motion for summary judgment.

The entry is:

Judgment affirmed.

---

ALEXANDER, J., concurring.

[¶31]  I am pleased to join the Court's opinion.  I write separately to note that the Maine Legislature has explicitly rejected the change in the law urged by the Dissent that would interpret current Maine law to mandate acceptance of onerous contract conditions that come with the Section 8 program by all landlords except those capable of assuming the heavy cost of litigation to demonstrate "business necessity" to avoid the contractual mandates.

[¶32]  Since its inception, the Section 8 Housing Choice Voucher Program, established pursuant to 42 U.S.C.A. § 1437f(o) (West, Westlaw through P.L. 113-65 (excluding P.L. 113-54) approved 12-20-13) and 24 C.F.R. pt. 982 (2013),[7] has been a voluntary program with property owners free to choose to enter into lease contracts with tenants supported by vouchers only if "the owner is willing to lease the unit under the program."  24 C.F.R. § 982.302(b); *see also Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150,

---

[7]  The Department of Housing and Urban Development regulations covering the voucher program, including the requirements imposed on property owners at 24 C.F.R. pt. 982, extend to eighty-two pages of double column, small print text in the Code of Federal Regulations.  Access to and comprehension of those regulations may present a considerable challenge to many individual property owners covered by this law.

1161-62 (9th Cir. 2011), *cert. denied* 132 S.Ct. 756 (2011); *Edwards v. Hopkins Plaza Ltd. P'ship*, 783 N.W.2d 171, 176 (Minn. Ct. App. 2010).

[¶33]  As the Court's Opinion notes, the Section 8 program in Maine has been administered as a voluntary program.  This litigation represents an attempt, promoted by the Maine Human Rights Commission, to convert the Section 8 program in Maine into a compulsory program and to secure by judicial action an amendment to the housing discrimination laws that the Maine Legislature explicitly refused to adopt.

[¶34]  The record reflects that in 2007, the Maine Human Rights Commission supported an effort to amend former 5 M.R.S. § 4582 (2007), now 5 M.R.S. § 4581-A(4) (2013), to make it unlawful to decline to rent properties because of the additional contractual burdens imposed on owners as a condition for rental to individuals whose rent would be supported by Section 8 housing vouchers.  L.D. 685, § 2 (123rd Legis. 2007).  This effort to change the discrimination laws from prohibiting different, special treatment of subsidized tenancies to requiring different, special treatment of subsidized tenancies failed. The provision mandating acceptance of the additional contractual burdens was stricken from the legislation that made other amendments to the Maine Human Rights Act.  Comm. Amend. A to L.D. 685, No. S-162 (123rd Legis. 2007).  The other revisions of law were then enacted as P.L. 2007, ch. 243.

[¶35]    The Legislature's specific refusal to change the housing discrimination law from the interpretation we gave it in *Catir v. Commissioner of the Department of Human Services*, 543 A.2d 356 (Me. 1988), is an indicator of legislative intent that must be respected.

[¶36]  Our rules of statutory construction establish that when a law has been interpreted by a judicial opinion, we do not later change that interpretation absent "clear and explicit" statutory language demonstrating legislative intent to change prior case law.  *Caron v. Me. Sch. Admin. Dist. No. 27*, 594 A.2d 560, 563 (Me. 1991) (stating that, absent clear and explicit statutory language showing legislative intent to modify case law interpreting a statute, this Court will not interpret a statute to effect such a modification); *see also Tripp v. Philips Elmet Corp.*, 676 A.2d 927, 930-31 (Me. 1996) (same); *Rubin v. Josephson*, 478 A.2d 665, 671 (Me. 1984) (same).

[¶37]    Here there has been no "clear and explicit" statutory language demonstrating legislative intent to change the interpretation we adopted in *Catir*.  To the contrary, there is an explicit refusal by the Maine Legislature to enact the change in the law supported by the Maine Human Rights Commission and apparently adopted by the dissent today.  Such a major change of policy is a matter best left to resolution by the Maine Legislature after it considers all the implications of such a change.  It is not a change that should be adopted by judicial

action after the Legislature refused to make the change supported by the Maine Human Rights Commission.

------

LEVY, J., with whom GORMAN and JABAR, JJ., join, dissenting.

[¶38] I agree with the Court's conclusion that the Maine Human Rights Act (MHRA), 5 M.R.S. §§ 4551-4634 (2007), does not make participation in the Section 8 housing assistance program mandatory, and that the MHRA prohibits landlords from intentionally discriminating against recipients of public assistance. However, I conclude that the MHRA prohibits housing practices that have a disparate impact on recipients of public assistance when such decisions are not justified by a business necessity. I also disagree with the Court's conclusion that Coach Lantern did not "refuse to rent" to Dussault for purposes of section 4582. For these reasons, I respectfully dissent.

A.    Whether Coach Lantern "Refused to Rent" to Dussault

[¶39] Before discussing why disparate impact liability applies in this case, it is necessary to address the threshold question of whether Coach Lantern's actions exposed it to liability pursuant to the MHRA. The MHRA deems it unlawful "to refuse to rent or impose different terms of tenancy" primarily because of an individual's status as a recipient of public assistance. 5 M.R.S. § 4582. The Court

concludes that Coach Lantern did not "refuse to rent" to Dussault because Coach Lantern expressed its willingness to rent to her so long as it could do so without including the HUD tenancy addendum in its lease. Court's Opinion ¶ 16. The Court relies heavily on our holding in *Catir v. Commissioner of the Department of Human Services*, 543 A.2d 356, 357-58 (Me. 1988), which was decided before the "business necessity" defense was added to section 4583 in 2007. *See* P.L. 2007, ch. 243, § 4 (effective Sept. 20, 2007). In *Catir*, we upheld a summary judgment for a nursing home that terminated its participation in the Medicaid program because "there [was] no allegation or suggestion that the nursing home 'refuse[d] to rent or impose[d] different terms of tenancy' on Medicaid recipients" by making them pay the same higher rate as non-Medicaid patients. 543 A.2d at 357-58 (first alteration added) (quoting 5 M.R.S.A. § 4582 (Pamph. 1987)).

[¶40]  *Catir* is inapposite to the present case for several reasons. First, our opinion stated that the material facts were "undisputed," *id.* at 357, and that the "*plaintiffs' affidavits* clearly establish that the nursing home refused to accept the lower Medicaid payment and subjected the recipients to the same terms of tenancy offered to any other individual," *id.* at 358 (emphasis added). Thus, the summary judgment record demonstrated that the nursing home's refusal to serve the plaintiffs as Medicaid patients was not based on the plaintiffs' status as recipients of public assistance, but was instead based on its decision to no longer accept the

Medicaid reimbursement rate. Because *Catir* was decided before the business necessity exception was added to section 4583, we had no reason to consider whether the nursing home's refusal to accept the Medicaid reimbursement rate was based on business necessity.

[¶41] Second, the more fundamental issue in *Catir* was not whether the nursing home "refuse[d] to rent" to its Medicaid recipients, but whether it "impose[d] different terms of tenancy" on them by making them pay the higher private rate that non-Medicaid patients paid. In holding that the nursing home had not imposed different terms of tenancy, we noted that "[t]he equality of housing access secured by the Maine Human Rights Act is premised upon the assumption that the persons seeking the housing have the ability to pay." 543 A.2d at 358. In contrast with the plaintiffs' presumed inability to pay the higher private rate at issue in *Catir*, there is no dispute here that Dussault, with the assistance of the Section 8 housing subsidy, had the ability to pay the rent asked by Coach Lantern.

[¶42] In extending *Catir* so that it controls the outcome of this case, the Court adopts too narrow a view of what it means for a landlord to "refuse to rent" to a prospective tenant. Here, Coach Lantern would not rent an apartment to Dussault so long as the HUD tenancy addendum was included in the lease. Therefore, regardless of the reason for its refusal, Coach Lantern "refused to rent" to Dussault pursuant to the plain language of section 4582. The Court's

characterization of Coach Lantern as being "willing" to rent to Dussault is misplaced, for Coach Lantern was "willing" to rent to Dussault only if she relinquished her status as a recipient of public assistance. Court's Opinion ¶ 16. The Court's interpretation of section 4582 would effectively sanction a landlord's refusal to rent to a tenant based on the tenant's protected status so long as the landlord simply asserted that it was "willing" to accept the tenant should she change her status.

[¶43]   On the facts before us, I conclude that Coach Lantern "refused to rent" to Dussault pursuant to section 4582. I now turn to whether Coach Lantern's refusal to rent was "primarily because of" Dussault's status as the recipient of public assistance.

B.    Disparate Impact Liability Pursuant to the MHRA

[¶44]   The MHRA makes it unlawful "to refuse to rent . . . to any individual . . . primarily because of the individual's status as [a] recipient" of public assistance. 5 M.R.S. § 4582. The Court construes the phrase "primarily because of" to proscribe only intentional discrimination against recipients of public assistance, and not housing decisions that have a disparate impact on such recipients. This construction, which was not argued by Coach Lantern before the Superior Court or this Court, is contrary to sections 4582 and 4583.

1.      The Plain Meaning of Sections 4582 and 4583 Recognizes Disparate Impact Liability

[¶45]  "When construing the language of a statute, we look first to the plain meaning of the language to give effect to the legislative intent." *Stromberg-Carlson Corp. v. State Tax Assessor*, 2001 ME 11, ¶ 9, 765 A.2d 566. A statute's plain meaning must be considered through the lens of "the whole statutory scheme for which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved."  *Id.* (quotation marks omitted).  To give effect to the intent of the Legislature, "[w]ords must be given meaning and not treated as meaningless and superfluous." *Id.*

[¶46]  The question before us is what it means for a landlord to refuse to rent to a tenant "primarily because of" the tenant's status as a recipient of public assistance pursuant to section 4582.  The Court's holding—that "primarily because of," on its face, only prohibits housing decisions that are intentionally discriminatory—misreads the statute.  Whether a housing decision is "primarily because of" a tenant's protected status can mean either (1) that the decision had a discriminatory purpose, or (2) that the decision resulted in a disparate impact on members of a protected group that was *functionally equivalent* to intentional discrimination.  "'[T]he necessary premise of the disparate impact approach is that some [housing] practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination.'"

*Mountain Side Mobile Estates P'ship v. Sec'y of Hous. & Urban Dev.*, 56 F.3d 1243, 1250-51 (10th Cir. 1995) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988)) (second alteration in original). This construction accords with the Supreme Court's adoption of disparate impact liability in the face of statutory language that, as is true here, does not explicitly mention disparate impact liability. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 429-36 (1971) (holding that disparate impact liability is contemplated by Title VII's prohibition on employment tests that are "'designed, intended or used to discriminate because of race'") (quoting the Civil Rights Act of 1964, Pub. L. No. 88-352, § 703(h), 78 Stat. 241, 257 (codified as amended at 42 U.S.C.A. § 2000e-2 (West, Westlaw through P.L. 113-65 (excluding P.L. 113-54) approved 12-20-13))).

[¶47] This construction of section 4582 is confirmed by viewing it in conjunction with the business necessity defense established in section 4583. Section 4583 dictates that the MHRA must be construed to permit housing practices that are both (1) "consistent with business necessity" and (2) "not based on" an individual's status as a member of a protected class, including recipients of public assistance:

> Nothing in this Act may be construed to prohibit or limit the exercise of the privilege of every person and the agent of any person having the right to sell, rent, lease or manage a housing accommodation to set up and enforce specifications in the selling, renting, leasing or letting . . . of facilities . . . that are consistent with business necessity and are not based on the race, color, sex, sexual

orientation, physical or mental disability, religion, country of ancestral origin or familial status of or the receipt of public assistance payments by any prospective or actual purchaser, lessee, tenant or occupant.

5 M.R.S. § 4583. Section 4583 creates a defense to liability pursuant to the MHRA that is relevant only if a housing decision is "not based on" a protected status, i.e., if the decision is not purposefully discriminatory but nonetheless has a disparate impact on a protected class. The business necessity defense is specifically tailored to defending against claims of disparate impact liability. *See Me. Human Rights Comm'n v. Can. Pac. Ltd.*, 458 A.2d 1225, 1233 n.16 (Me. 1983) ("[The business necessity defense] is thus available only to validate uniform employment criteria having a discriminatorily disparate impact."); *Me. Human Rights Comm'n v. City of Auburn*, 408 A.2d 1253, 1264-66 (Me. 1979) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425-34 (1975), and *Griggs*, 401 U.S. at 431, for the proposition that a plaintiff's prima facie case of disparate impact may be countered by a showing of business necessity). Thus, a facially neutral housing practice that has a disparate impact on a protected group is not discriminatory if it is "consistent with business necessity." 5 M.R.S. § 4583.

[¶48] Any doubt as to the proper construction of sections 4582 and 4583 is erased by the statute's legislative history.[8] The 2007 amendment to the MHRA

---

[8] The majority concludes that 5 M.R.S. § 4582 (2007) unambiguously precludes disparate impact liability, and accordingly excludes 5 M.R.S. § 4583 (2007)'s legislative history from its analysis. This construction of section 4582 conflicts with the business necessity defense—a defense specifically tailored to defend against claims of disparate impact liability—established by section 4583. At the very least,

that, among other things, added the "business necessity" language to section 4583 expressly states that it "amends the Maine Human Rights Act to . . . prohibit unreasonable housing practices that have a disparate impact on the basis of . . . the receipt of public assistance payments." L.D. 685, Summary (123rd Legis. 2007); P.L. 2007, ch. 243, § 4 (effective Sept. 20, 2007) (codified at 5 M.R.S. § 4583 (2012)). The Legislature's intent to subject claims of housing discrimination based on the receipt of public assistance payments to disparate impact analysis, and to permit landlords to justify their practices based on a showing of business necessity, could not be clearer.[9]

2. The MHRA's Recognition of Disparate Impact Liability Does Not Make Participation in Section 8 Mandatory

[¶49] I agree with the Court that the MHRA does not make landlords' participation in the Section 8 housing voucher program mandatory. Nothing in the construction of the MHRA set out above requires landlords to participate in the Section 8 program. Rather, the statute simply prohibits landlords from

there exists ambiguity in the statute that requires consultation of the relevant legislative history. Because the "primary purpose in statutory interpretation is to give effect to the intent of the Legislature," *Arsenault v. Sec'y of State*, 2006 ME 111, ¶ 11, 905 A.2d 285, the proper construction of the statute must recognize that the Legislature expressly provided that the business necessity defense is available to defend against disparate impact claims based on "the receipt of public assistance payments by any prospective or actual purchaser, lessee, tenant or occupant." 5 M.R.S. § 4583.

[9] The Court's assertion that the Legislature "would have effectively overruled our holding in *Catir*" by creating disparate impact liability pursuant to section 4582 is incorrect. *See* Court's Opinion ¶ 28. As discussed above, our holding in *Catir* was sufficiently distinguishable—and cursory—that the Legislature's contemplation of disparate impact liability in section 4582 did not infringe upon our holding in that case. *See Catir v. Comm'r of Dep't of Human Servs.*, 543 A.2d 356, 357-58 (Me. 1988).

discriminating, either in word or in effect, against recipients of public assistance. The Legislature's provision for these two forms of liability cannot be properly understood as making participation in Section 8 mandatory.

[¶50] The concurrence, in arguing that the MHRA does not compel participation in Section 8, places significant weight on the fact that in 2007 the Judiciary Committee struck a proposed amendment to 5 M.R.S. § 4582 that would have made it unlawful for landlords to refuse to rent or impose different terms of tenancy to any recipient of public assistance "primarily because of the individual's status as recipient or because of any requirement of such a public assistance program." *See* L.D. 685 (123rd Legis. 2007); Comm. Amend. A to L.D. 685, No. S-162 (123rd Legis. 2007). The legislative history is silent as to why the Judiciary Committee decided to remove the proposed language from the enacted law, and any number of inferences can be drawn from the Committee's decision.[10] Further,

---

[10] It is important to note that Section 8 housing assistance is one of many "federal, state or local assistance" programs to which former section 4582 applied. Therefore, one interpretation of the Judiciary Committee's decision not to adopt the proposed change to section 4582 is that it was concerned about the consequences the change might have with respect to public assistance programs other than Section 8. The Judiciary Committee might also have concluded that the separate provision for disparate impact liability in L.D. 685, pursuant to section 4583, was sufficient to ameliorate concerns regarding landlords refusing to rent to tenants because of the requirements of participating in the Section 8 program. *See* Letter from Maine Human Rights Commission to Members of Joint Standing Committee on Judiciary 2 (April 5, 2007) (proposing amending section 4582 in order to "ensure that a housing provider cannot refuse to rent or impose different terms of tenancy because of the requirements of a public assistance program"). Finally, the Judiciary Committee might have concluded that the proposed amendment to section 4582 to add "any requirement of such a public assistance program" was not needed because a refusal to rent or imposition of different tenancy terms on that basis was already encompassed by the existing statutory language, "primarily because of the individual's status as recipient." The letter of the Executive Director of the Maine Human Rights Commission addressed to the Judiciary Committee that accompanied L.D. 685 suggested this very possibility. *See* Letter from Maine Human Rights Commission to Members of

this 2007 amendment to the MHRA is the very same one cited above that demonstrates the Judiciary Committee's desire, in no uncertain terms, to subject unreasonable housing practices to disparate impact liability. *See* L.D. 685, Summary (123rd Legis. 2007).

      3.     Federal Law Supports an Interpretation of Section 4582 that Creates Disparate Impact Liability

[¶51] A construction of sections 4582 and 4583 that recognizes disparate impact liability is also supported by federal law. "In enacting the Human Rights Act, Maine was legislating against the background of prior federal antidiscrimination statutes and a developing body of case law construing and applying those statutes." *City of Auburn*, 408 A.2d at 1261 (footnote omitted). Accordingly, we look to federal case law to "provide significant guidance in the construction of our statute." *Id.* (quoting *Me. Human Rights Comm'n v. Local 1361*, 383 A.2d 369, 375 (Me. 1978)).

[¶52] The federal counterpart to the MHRA's fair housing provisions is the Fair Housing Act (FHA), 42 U.S.C.A. §§ 3601-3631 (West, Westlaw through P.L. 113-65 (excluding P.L. 113-54) approved 12-20-13). The FHA provides that "it shall be unlawful . . . [t]o refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person *because of* race, color, religion, sex,

---

Joint Standing Committee on Judiciary 2 (April 5, 2007) (noting that the "recurring problem [of] landlords arguing that they do not want to do paperwork or comply with other requirements of public assistance programs such as Section 8 . . . arguably would violate the existing language" of section 4582).

familial status, or national origin." *Id.* § 3604(a) (emphasis added). Even though the words "because of" can be read to suggest solely intentional discrimination, every federal court of appeals but one has concluded that this FHA provision creates liability for intent-neutral disparate impact. *See, e.g.*, *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly*, 658 F.3d 375, 381-82 (3d Cir. 2011); *Gallagher v. Magner*, 619 F.3d 823, 833-38 (8th Cir. 2010); *Reinhart v. Lincoln Cnty.*, 482 F.3d 1225, 1229 (10th Cir. 2007); *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 49 (1st Cir. 2000); *Gamble v. City of Escondido*, 104 F.3d 300, 304-05 (9th Cir. 1997)*; Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996); *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 790 (6th Cir. 1996); *Knapp v. Eagle Prop. Mgmt. Corp.*, 54 F.3d 1272, 1280 (7th Cir. 1995); *Jackson v. Okaloosa Cnty.*, 21 F.3d 1531, 1543 (11th Cir. 1994); *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 986 (4th Cir. 1984). *But see Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. and Urban Dev.*, 639 F.3d 1078, 1085 (D.C. Cir. 2011) (declining to decide whether the FHA permits disparate impact claims as to grant administration, but assuming that it does). The nearly unified view of the federal courts further supports the construction of sections 4582 and 4583 that recognizes disparate impact liability in housing discrimination. *See City of Auburn*, 408 A.2d at 1261.

34

## C. Summary Judgment

[¶53] Because sections 4582 and 4583 recognize disparate impact liability, it is necessary to review the grant of summary judgment in favor of Coach Lantern on Dussault's claim of disparate impact.

[¶54] In analyzing a claim of disparate impact, courts employ a burden-shifting analysis similar to that employed when analyzing a claim of disparate treatment. *See City of Auburn*, 408 A.2d at 1264-65 (adopting this analysis in the employment discrimination context); *see also Mountain Side Mobile Estates P'ship*, 56 F.3d at 1250-54; *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 935-39 (2d Cir. 1988), *aff'd per curiam on other grounds*, 488 U.S. 15, 18 (1988). The first step of the analysis requires the party alleging discrimination to provide prima facie evidence that a facially neutral practice affects one group more harshly than another. *City of Auburn*, 408 A.2d at 1264. If the plaintiff produces a prima facie case, the burden of production shifts to the defendant to produce "credible evidence" of a genuine business necessity for the challenged practice. *Id.* at 1264-66. If the defendant meets that burden, the burden shifts back to the plaintiff to "show that the defendant was using his selection device as a pretext for discrimination." *Id.* at 1268 (quotation marks omitted). At all times, the ultimate burden of persuasion rests with the plaintiff. *Id.* at 1265.

[¶55]  Here, Dussault satisfies the first step of the analysis: Coach Lantern's refusal to include the HUD tenancy addendum in its leases effectively excludes one hundred percent of Section 8 recipients from renting from Coach Lantern.  *See* 24 C.F.R. § 982.308(b)(2) (2013) (requiring inclusion of HUD-prescribed addenda on all leases).  As we have said in the employment setting, where the "'inexorable zero'" exists, "the prima facie inference of discrimination becomes strong." *City of Auburn*, 408 A.2d at 1264 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 342 n.23 (1977)).  Because Dussault presented prima facie proof of discrimination, the burden shifted to Coach Lantern to produce evidence that its decision to not include the HUD tenancy addendum in its leases was justified by "credible evidence" of business necessity.  *Id.* at 1265.  This presents the question of what constitutes a "business necessity" pursuant to section 4583.

[¶56]  The idea that a business necessity can justify a practice having a disparate impact on a protected class originated in the context of federal employment discrimination law.  *See Griggs*, 401 U.S. at 431.  Federal courts have developed definitions of "business necessity" that inform the meaning of the term within the context of housing discrimination law.  *See, e.g.*, *Mountain Side Mobile Estates P'ship*, 56 F.3d at 1254.  Similarly, our employment discrimination case law provides guidance as to what should constitute a "business necessity" for

purposes of section 4583.[11]  In the employment discrimination context, we have interpreted "business necessity" to require, among other things, that an employment practice be "'necessary to safe and efficient job performance,'" and not be done out of "mere business convenience."  *City of Auburn*, 408 A.2d at 1265 (quoting *Dothard v. Rawlinson*, 433 U.S. 321, 331 n.14 (1977)).  In other words, the challenged practice must be shown by "credible evidence," *id.*, to be necessary to achieve a lawful and substantial nondiscriminatory interest of the defendant.  This approach is consistent with that taken in the federal rule recently adopted to implement the FHA's discriminatory effects standard.  *See* Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,460, 11,482 (Feb. 15, 2013) (to be codified at 24 C.F.R. pt. 100).  Applying this approach to section 4583, a business necessity is established when the challenged housing practice is not based on a protected status, and credible evidence demonstrates that the practice is necessary to achieve a "substantial, legitimate, nondiscriminatory interest" of the defendant.  *Id.* at 11,460.

---

[11]  At least one commentator has argued that although the definitions of "business necessity" created in employment law tend to inform the definitions adopted in housing law, housing law should apply a stricter standard.  *See* Lindsey E. Sacher, Note, *Through the Looking Glass and Beyond: The Future of Disparate Impact Doctrine Under Title VIII*, 61 Case W. Res. L. Rev. 603, 636 (2010) ("[T]he differences between housing and employment suggest that given the limited number of legitimate justifications for denying housing to a qualified applicant, [housing discrimination] defendants should bear a higher burden than [employment discrimination defendants] when seeking to rebut a prima facie case of disparate impact.").

[¶57]    Here, Coach Lantern's statement of material facts listed nine requirements of the HUD tenancy addendum that it finds objectionable.  It then asserted, in paragraph 25, that "Coach Lantern is unwilling to attach the [Section 8] Addendum to any of its leases because of the number of burdensome conditions contained therein and the fact that the Addendum alters a landlord's rights under state law."  Although Coach Lantern summarized the conditions of the addendum that it objects to, it failed to assert facts from which a fact-finder could determine that the conditions would interfere with any substantial, legitimate, and nondiscriminatory interest associated with its business.  Coach Lantern did not identify which addendum provisions differed from its own lease provisions, and it further failed to include a copy of its standard lease in the summary judgment record.  Because of this, it is impossible to identify the actual differences between Coach Lantern's lease agreement and the Section 8 addendum.  Similarly, Coach Lantern failed to identify which of its rights pursuant to state law would be altered if it were bound by a Section 8 addendum and the extent to which the alteration of those rights would interfere with the safe and efficient operation of its business.

[¶58]  Contrary to the Court's approach, whether a housing practice qualifies as a business necessity is a fact-intensive issue that the law requires the landlord to prove by credible evidence, not simply allege.  Where the proffered justification for a landlord's housing practice (here, Coach Lantern's assertion that provisions

of the HUD tenancy addendum are unduly onerous) applies exclusively and completely to a class of individuals who share a status protected by the MHRA (here, Dussault and all other recipients of Section 8 housing subsidies), only a fact-finder can determine whether the housing practice in fact qualifies as a business necessity and is not based on the individuals' protected status. Coach Lantern's statement of material facts does no more than assert that it objects to certain requirements of the addendum without offering any information from which a fact-finder could determine whether Coach Lantern's objection is based on "mere business convenience" or an actual business necessity. One can only speculate, for example, whether Coach Lantern will incur increased operating expenses if it adopts the addendum, and, if so, whether the increased expenses will be sufficiently substantial as to jeopardize the "safe and efficient" operation of its rental business. *City of Auburn*, 408 A.2d at 1265 (quotation marks omitted).

[¶59]  Accordingly, Coach Lantern did not meet its burden of showing that an actual business necessity justified its decision to refuse to include Section 8 addenda in its lease agreements. Because Dussault made an unrebutted prima facie case of disparate impact discrimination, her motion for summary judgment should have been granted and Coach Lantern's motion for summary judgment should have been denied. *See Mountain Side Mobile Estates P'ship*, 56 F.3d at 1254.

C.    Conclusion

[¶60]   With certain exceptions not applicable here, Maine landlords are required to comply with the Maine Human Rights Act.  The Act does not compel landlords to participate in the Section 8 housing voucher program so long as the landlord's decision does not intentionally discriminate against, or result in a disparate impact on, recipients of public assistance.  If a landlord's refusal to rent to recipients of public assistance has a disparate impact on such individuals, the landlord must have a legitimate, non-discriminatory reason—"business necessity"—for doing so.  5 M.R.S. § 4583.  Because Dussault made an unrebutted prima facie case of discrimination based on Coach Lantern's refusal to rent to her, I would vacate the judgment and remand for entry of a judgment in favor of Dussault and for a determination of her remedies.

---

**On the briefs:**

Patricia M. Ender, Esq., and Katherine McGovern, Esq., Pine Tree Legal Assistance, Inc., Augusta and Portland, for appellant Nicole Dussault

Margaret Coughlin LePage, Esq., and Katharine I. Rand, Esq., Pierce Atwood, LLP, Portland, for appellees RRE Coach Lantern Holdings, LLC, and Resource Real Estate Management, Inc.

John P. Gause, Esq., Maine Human Rights Commission, Augusta, for amicus curiae Maine Human Rights Commission

40

Justin W. Andrus, Esq., and Neil S. Shankman, Esq., Shankman & Associates, Topsham, for amicus curiae Maine Apartment Owners and Managers Association

Mark C. Joyce, Esq., Disability Rights Center of Maine, Augusta, for amicus curiae Disability Rights Center of Maine

John J. McDermott, Esq., National Apartment Association, Arlington, Virginia, and David J. Van Baars, Esq., Windham, for amici curiae National Apartment Association and Maine Apartment Association

J. Danian Ortiz, Esq., Patrick Bushell, Law Student, and Ian Friel, Law Student, The John Marshall Law School Fair Housing Center & Clinic, Chicago, Illinois, and David A. Lourie, Esq., Portland, for amicus curiae The John Marshall Law School Fair Housing Center & Clinic

Robert Edmond Mittel, Esq., MittelAsen LLC, and Danielle Pelfrey Duryea, Esq., James P. Dowden, Esq., and Thomas R. Sutcliffe, Esq., Ropes & Gray LLP, Boston, Massachusetts, for amici curiae National Center for Medical Legal Partnership and Lawyers' Committee for Civil Rights and Economic Justice

**At oral argument:**

Patricia M. Ender, Esq., for appellant Nicole Dussault

Katharine I. Rand, Esq., for appellees RRE Coach Lantern Holdings, LLC, and Resource Real Estate Management, Inc

Cumberland County Superior Court docket number CV-2010-347